

DIS/DAJ: USAO 2002R00995



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PJM 10 CR 0295** |
| | * | |
| **NADER MODANLO,** | * | **(Conspiracy, 18 U.S.C. § 371; Violation** |
| a/k/a Nader Modanlou, | * | **of the International Emergency** |
| a/k/a Nader Modanlu, | * | **Economic Powers Act, 50 U.S.C.** |
| **HAMID MALMIRIAN,** | * | **§ 1705(b); Money Laundering,** |
| **REZA HEIDARI,** | * | **18 U.S.C. §§ 1956(a)(2)(A) and 1957;** |
| a/k/a Reza Heydari, | * | **Aiding and Abetting, 18 U.S.C. § 2;** |
| a/k/a Reza Heidary, | * | **Forfeiture, 18 U.S.C. § 981(a)(1)(C),** |
| a/k/a Reza Heydary, | * | **18 U.S.C. § 982, 28 U.S.C. § 2461(c))** |
| a/k/a Reza Heydarj, | * | |
| **MOHAMMAD MODARES,** | * | |
| a/k/a Mohammad Modarres, | * | |
| **ABDOL REZA MEHRDAD, and** | * | |
| **SIROUS NASERI,** | * | |
| a/k/a Cyrus Nasseri, | * | |
| a/k/a Cirous Nasseri, | * | |
| a/k/a Sirus Naseri, | * | |
| | * | |
| **Defendants** | * | |
| | * | |

**\*\*\*\*\*\*\***

## INDICTMENT

### COUNT ONE

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

**A.    The Defendants and Other Relevant Persons and Entities**

1.    **NADER MODANLO, a/k/a Nader Modanlou, a/k/a Nader Modanlu**

**("MODANLO")** was an Iranian-born naturalized American citizen and a resident of Potomac,

Maryland. **MODANLO** was a mechanical engineer who received science and engineering degrees from George Washington University. In his work, **MODANLO** represented that he was an internationally-recognized expert on strategic policy and financial matters affecting the space-based telecommunications industry, and that he managed space and science programs for the Department of Defense, National Aeronautics and Space Administration, and industry.

2.      In or about 1992, **MODANLO** and a partner incorporated Final Analysis, Inc. ("FAI") in Maryland. **MODANLO** was a principal owner and served as chairman and president. FAI was one of the first companies to launch a satellite from Russia.

3.      In or about 1993, Final Analysis Communications Services ("FACS") was organized in Maryland as a subsidiary of FAI to construct, launch and operate a constellation of low earth orbit satellites for global wireless communications ("FAI satellites" or "FAISAT"). FAI served as the general contractor to the FAISAT system.

4.      **MODANLO** served as president of FACS. He and approximately fifty other persons invested in FACS.

5.      On or about September 4, 2001, creditors filed a petition in the United States Bankruptcy Court for the District of Maryland to place FAI into involuntary bankruptcy pursuant to Chapter 7 of the Bankruptcy Code. The case was docketed as No. 01-21039 ("the FAI bankruptcy").

6.      In or about November 2001, **MODANLO** established New York Satellite Industries, LLC ("NYSI"), a Delaware limited liability company. NYSI purchased FAI's assets and held a majority of FACS stock. **MODANLO** served as Chairman and Managing member of NYSI, and used his home address as NYSI's business address.

2

7.     Defendant **HAMID MALMIRIAN ("MALMIRIAN")** was a citizen of the Islamic Republic of Iran who at various times held himself out in various capacities as an Iranian government representative. **MALMIRIAN** held himself out as a representative of Mohan Iranian Airlines; the Head of the Experimental Department, Institute of Survey Engineering for the Islamic Republic of Iran; and the General Director of the National Geographical Organization in Teheran, Iran.

8.     Defendant **SIROUS NASERI, a/k/a Cyrus Nasseri, a/k/a Cirous Nasseri, a/k/a Sirus Naseri ("NASERI"),** was a citizen of the Islamic Republic of Iran who at various times was an Iranian consultant to the International Telecommunications Union ("ITU") and a consultant to the Foreign Ministry in Iran. In or about 1999, **NASERI** also was a paid consultant to FAI.

9.     Defendant **REZA HEIDARI, a/k/a Reza Heydari, a/k/a Reza Heidary, a/k/a Reza Heydary, a/k/a Reza Heydarj ("HEIDARI"),** was a citizen of the Islamic Republic of Iran.

10.     Defendant **MOHAMMAD MODARES, a/k/a Mohammad Modarres ("MODARES")** was a citizen of the Islamic Republic of Iran.

11.     Defendant **ABDOL REZA MEHRDAD ("MEHRDAD")** was a citizen of the Islamic Republic of Iran.

12.     Prospect Telecom AG ("Prospect Telecom") was incorporated in Foreign Country A in 2002 by persons known to the Grand Jury at the direction of **NASERI, MALMIRIAN, HEIDARI, MODARES, MEHRDAD** and **MODANLO.**

13.     Sarl Morrisson Trade and Finance, a/k/a Sarl Morisson Trade & Finance ("Sarl Morrisson") was incorporated in France in or about November 1998.

14.     POLYOT was an aerospace enterprise company owned by the government of the Russian Federation.  Its activities included the construction and launch of telecommunications satellites.

**B.      The International Emergency Economic Powers Act, the Iran Trade Embargo, and the Iranian Transactions Regulations**

15.     The International Emergency Economic Powers Act ("IEEPA") authorized the President of the United States to exercise certain authorities to deal with any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States that originated in whole or substantial part outside the United States and with respect to which the President had declared a national emergency.  After such a declaration, in order to deal with the threat, the President could, among other things, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in transactions, involving any property in which any foreign country or a national thereof has any interest, or with respect to any property subject to the jurisdiction of the United States.  The President therefore had the power to impose prohibitions or  restrictions on exports and other transactions in times of national emergency, to deal with any foreign threat to the national security, foreign policy or economy of the United States.

16.     In 1995, the President issued Executive Order 12957, finding that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national

4

security, foreign policy, and economy of the United States and declaring a national emergency to deal with the threat. In that same year, the President also issued Executive Order 12959 ("EO 12959") to take additional steps with respect to the national emergency declared in Executive Order 12957 and imposed a trade embargo against Iran ("the Iran Trade Embargo"). The Executive Orders were in effect at all times relevant to this Indictment.

17.     Among other things, the Iran Trade Embargo prohibited the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology or services by a United States person. **MODANLO** was a United States person for purposes of the Embargo. The Iran Trade Embargo also prohibited any transaction by any United States person, or within the United States, that evaded or avoided, or had the purpose of evading or avoiding, or attempted to violate, any of the prohibitions set forth in the Iran Trade Embargo. On August 19, 1997, the President issued Executive Order 13059, which reiterated and consolidated the Iran Trade Embargo. The Iran Trade Embargo was in effect at all times relevant to this Indictment.

18.     To implement the Iran Trade Embargo, the Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, to take such actions, including the promulgation of rules and regulations, that were necessary to carry out the purposes of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders.

19.     The ITR prohibited (1) the export, re-export, sale or supply, directly or indirectly, by a United States person, of goods, technology or services to Iran or the Government of Iran; and (2) the financing of such export, re-export, sale or supply, of any goods, technology or

5

services, without the prior authorization of OFAC.  The ITR further prohibited any transaction by any United States person that evaded or avoided, or had the purpose of evading or avoiding, or attempted to violate, any of the prohibitions contained in the ITR.

### C.   Contract with POLYOT to Launch Satellites

20.    Beginning in or about 1994, FAI entered into a contract with POLYOT, which provided that POLYOT would launch FAI satellites.  FAI planned to establish a constellation of satellites to provide data communication and other telecommunication information to customers around the globe through licensing and service provider agreements.  As required by law, **MODANLO** obtained United States export licenses for the purpose of launching the telecommunications satellites and other equipment from Russia.

a.    On or about January 24, 1995, an FAI commercial satellite was launched from a Russian launch facility.  POLYOT provided launch services for the telecommunications satellite, which was known as FAISAT-1.

b.    Between January 1995 and 1997, FAI and POLYOT designed and constructed a second satellite, FAISAT-2v, which FAI and POLYOT launched on September 23, 1997.

c.    In or about September 1999, FAI and POLYOT signed a contract to design and construct an in-orbit communications subsystem, known as FAISAT-3v, which FAI and POLYOT launched using a Russian rocket in or about July 2000.

21.     As part of FAI's relationship with POLYOT, **MODANLO** and other FAI

personnel personally met with POLYOT officials.

### D.     Brokering the Russian Launch of Iranian Satellite and Providing Telecommunications Services to Iranians

22.     In or about 2000, Iranian persons, including **MALMIRIAN,** arranged to visit

POLYOT's satellite and launch production facilities in Russia to discuss potential future

cooperation.  In addition, Iranian officials, including **MALMIRIAN,** met with **MODANLO** in

Moscow and elsewhere to facilitate Iranian contact with POLYOT.  **MODANLO,** POLYOT

officials,  **MALMIRIAN** and other Iranian citizens met to discuss a Russian-Iranian satellite

agreement.

23.     In or about December 2001, POLYOT and Iranian officials reached an agreement

for the design, development, assembly, integration, test and launch of a small low-earth orbiting

spacecraft named SMALL-SAT and the installation of a ground station ("the SMALL-SAT

Agreement").

24.     Between December 2001 and April 2002, **MODANLO, MALMIRIAN,**

**NASERI, HEIDARI** and **MODARES** traveled to Foreign Country A to form a front company

to conceal the Iranians' involvement with **MODANLO.**

25.     To that end, between April and June 2002, **NASERI, HEIDARI, MODARES,**

**MEHRDAD** and **MODANLO** formed and caused to be formed Prospect Telecom in Foreign

Country A.  To conceal their involvement with Prospect Telecom from others, **HEIDARI,**

**MODARES** and **MEHRDAD** engaged others known to the Grand Jury to assume nominal

control of Prospect Telecom stock.  To further conceal their involvement in the formation and

ownership of Prospect Telecom, **HEIDARI** and **MODARES** caused others known to the Grand Jury to transfer their shares and interest in Prospect Telecom to Sarl Morrisson. **HEIDARI, MODARES** and **MEHRDAD** used false French addresses to conceal their connection to Prospect Telecom and Sarl Morrisson. In fact, **HEIDARI, MODARES** and **MEHRDAD** were the true and beneficial owners of Prospect Telecom.

26.     Between May and June 2002, **NASERI, HEIDARI, MODARES, MEHRDAD** and **MODANLO** also caused to be opened an account at Bank A in Foreign Country A in the name of Prospect Telecom. **NASERI, HEIDARI, MODARES, MEHRDAD** then transferred and caused to be transferred about $10 million into the Prospect Telecom account for the purpose of providing funds to **MODANLO** and his company, NYSI. The funds were transferred from four other accounts, including an account controlled by **HEIDARI.**

27.     On or about June 7, 2002, $10 million was wire transferred from the Prospect Telecom account in Foreign Country A to the NYSI account in Bowie, Maryland as consideration for **MODANLO**'s assistance to Iran and the Iranians in connection with the SMALL-SAT Agreement and for providing telecommunications services in support of that Agreement.

28.     On or about October 27, 2005, POLYOT launched into space from Plesetsk, Russia a rocket, built by POLYOT, that contained an Iranian earth satellite equipped with a camera.

29.     To further conceal **MODANLO**'s involvement with the Iranians and the Islamic Republic of Iran, **MODANLO, HEIDARI, MODARES, MEHRDAD** and others concealed the Iranian identity of the beneficial owners of Prospect Telecom during bankruptcy proceedings.

30.     **MODANLO,** FAI, FACS, NYSI, **MALMIRIAN, HEIDARI, MODARES,**

**MEHRDAD** and **NASERI** did not apply for or receive the required licenses or authorizations

from OFAC to export or broker services to Iran.

### E.     Bankruptcy Proceedings

31.     The FAI bankruptcy proceedings, originally filed in 2001, remained pending at all

times relevant to this case.  In addition, on or about July 22, 2005, **MODANLO** personally filed

a bankruptcy petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the District of Maryland.  The case was docketed as No. 05-26549 ("the Modanlo

bankruptcy")

32.     On or about January 10, 2006, NYSI filed a bankruptcy petition under Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland.  The

case was docketed as No. 06-10158 ("the NYSI bankruptcy").

33.     A trustee was appointed in the **MODANLO** on or about January 10, 2006.  To

fulfill his duties to the estate, the Chapter 11 Trustee requested information about Prospect

Telecom and its foreign bank account, and took the deposition of **MODANLO** on or about

November 27, 2007.  The Chapter 11 Trustee also demanded and received information from

attorneys representing Prospect Telecom.

**The Conspiracy**

34.     Beginning in or about January 2000 and continuing through at least in or about

November 2007, in the District of Maryland and elsewhere, the defendants,

**NADER MODANLO,**
**HAMID MALMIRIAN,**
**REZA HEIDARI,**
**a/k/a Reza Heydari,**
**a/k/a Reza Heidary,**
**a/k/a Reza Heydary,**
**MOHAMMAD MODARES,**
**a/k/a Mohammad Modarres,**
**ABDOL REZA MEHRDAD**
**and**
**SIROUS NASERI,**
**a/k/a Cyrus Nasseri,**
**a/k/a Cirous Nasseri,**
**a/k/a Sirus Naseri,**

did knowingly combine, conspire, confederate and agree with one another, and with others

known and unknown to the Grand Jury:

a.      to defraud an agency of the United States by impairing, impeding,

obstructing and defeating the lawful government functions of the

Department of Treasury to enforce laws and regulations described herein

regarding the export and brokering of goods and services to Iran; and

b.      to commit an offense against the United States, to wit, to knowingly and

willfully violate an order and regulation issued under Chapter 35 of

Title 50, United States Code, specifically the Iran Trade Embargo

contained in Executive Orders 12959 and 13059 and 31 C.F.R. Part 560,

namely,

(1)     to conduct a transaction by a United States person and within the

United States that evades and avoids, and has the purpose of

evading and avoiding, and attempts to violate, the prohibitions

contained in 31 C.F.R. Part 560, in violation of 50 U.S.C. §§ 1705

and 1702, and 31 C.F.R. § 560.203;

(2)     to export, sell and supply, directly and indirectly, from the United

States, and by a United States person, wherever located, services to

Iran and the Government of Iran, except as otherwise authorized

pursuant to 31 C.F.R. Part 50, in violation of 50 U.S.C. §§ 1705

and 1702, and 31 C.F.R. § 560.204; and

(3)     to be a United States person, wherever located, and engage in a

transaction and dealing in and related to services for exportation,

sale and supply, directly and indirectly, to Iran and the Government

of Iran, except as otherwise authorized pursuant to 31 C.F.R.

Part 50, in violation of 50 U.S.C. §§ 1705 and 1702, and 31 C.F.R.

§ 560.206.

### The Object of the Conspiracy

35.     The object of the conspiracy was to evade the Iran Trade Embargo by using sham

companies, including Prospect Telecom, to conceal Iranian involvement in the prohibited

activities and transactions.

11

### Manner and Means of the Conspiracy

The manner and means of committing the conspiracy included the following:

36.    It was part of the conspiracy that defendants **NASERI, MALMIRIAN** and others known and unknown to the Grand Jury traveled to Russia and other locations to contact defendant **MODANLO** and discuss the brokering of satellite hardware/technology and launches from Russia for the benefit of Iran.

37.    It was further part of the conspiracy that **MODANLO** brokered an agreement between POLYOT and a customer in Iran to construct and launch satellites and a ground station.

38.    It was further part of the conspiracy that defendants **MODANLO, NASERI, HEIDARI** and **MALMIRIAN** traveled to Foreign Country A to seek an intermediary to form Prospect Telecom in order to conceal Iranian participation as an investor/lender in defendant **MODANLO**'s satellite telecommunications activities.

39.    It was further part of the conspiracy that defendants **HEIDARI, MODARES** and **MEHRDAD** signed documents establishing Prospect Telecom and became its beneficial owners.

40.    It was further part of the conspiracy that defendants **NASERI, HEIDARI** and **MODARES** established and caused to be established an account with Bank A in Foreign Country A in the name of Prospect Telecom.

41.    It was further part of the conspiracy that defendants **HEIDARI, MODARES** and **MODANLO** caused approximately $10 million to be wired from Prospect Telecom's bank account in Foreign Country A to defendant **MODANLO**'s NYSI account in Bowie, Maryland.

42.    It was further part of the conspiracy that defendants **HEIDARI** and **MODANLO** agreed that NYSI would assist in the granting of telecommunications service provider licenses to

12

the beneficial owners of Prospect Telecom and to the Islamic Republic of Iran.

43.     It was further part of the conspiracy that in or about October 2005, as a result of the efforts of defendants **MODANLO, MALMIRIAN, HEIDARI, MODARES, MEHRDAD, NASERI** and coconspirators, the Iranian government launched a telecommunications satellite from Russia.

44.     It was further part of the conspiracy that defendants **MODANLO** and **HEIDARI** attempted to conceal information about Iranian interests in Prospect Telecom by providing false information about Prospect Telecom during bankruptcy proceedings.

### Overt Acts

In furtherance of the conspiracy and to effect the objects of the conspiracy, the defendants **MODANLO, MALMIRIAN, HEIDARI, MODARES, MEHRDAD, NASERI** and coconspirators committed and caused to be committed at least one of the following acts, among others, in the District of Maryland and elsewhere:

A.     Between on or about December 8, 2001 and on or about December 13, 2001, **HEIDARI, MODARES, MALMIRIAN** and a person known to the Grand Jury rented hotel rooms at the Hotel Novotel in Foreign Country A.

B.     On or about December 8, 2001, **MODANLO** rented a hotel room at the Renaissance Hotel in Foreign Country A.

C.     On or about December 10, 2001, **NASERI, HEIDARI** and **MALMIRIAN** met in Foreign Country A to discuss the formation of a foreign company to act as intermediary to make Iranian investments in a U.S. telecommunications company.

13

D.      On or about March 14, 2002, **NASERI** and **MODANLO** met in Foreign Country A to further discuss the formation of a foreign company that would engage in a $10 million financial transaction with NYSI.

E.      On or about April 26, 2002, **NASERI, MODANLO, HEIDARI** and **MODARES** met in Foreign Country A to further discuss the formation of a foreign company, which they named Prospect Telecom.  At the meeting, **MODANLO** presented a written draft loan agreement for $10 million between NYSI and Prospect Telecom.

F.      On or about April 27, 2002, **HEIDARI** executed a Power of Attorney as Administrator for Sarl Morrisson.

G.      On or about April 29, 2002, **HEIDARI, MODARES, MEHRDAD** and **NASERI** caused to be opened an account at Bank A in Foreign Country A in the name of Prospect Telecom.

H.      On a date unknown to the Grand Jury, but no earlier than April 29, 2002, **MODANLO, NASERI, MODARES** and **HEIDARI**, at a bank in Foreign Country A, advised a person known to the Grand Jury that they wanted to invest in **MODANLO**'s company.

I.      Between on or about April 24 and on or about May 1, 2002, **HEIDARI** and **MODARES** rented hotel rooms at the Hotel Glockenhof in Foreign Country A .

J.      Between on or about April 24 and on or about May 1, 2002**, MODANLO** rented a hotel room at a Marriott Hotel in Foreign Country A.

K.      On or about May 2, 2002, conspirators including **NASERI** caused $100,000 from the Bank Saderat Iran to be deposited into Prospect Telecom's bank account to formally open the account.

L.     On or about a date unknown to the Grand Jury, but no earlier than April 26, 2002,

**MODANLO, HEIDARI, MODARES, NASERI** and others known to the Grand Jury executed

and caused the execution of a written loan agreement for $10 million between NYSI and

Prospect Telecom ("the Prospect Telecom-NYSI Loan Agreement").

M.     On or about May 10, 2002, **MODANLO, HEIDARI, MODARES, MEHRDAD**

and **NASERI** and others known to the Grand Jury caused Prospect Telecom to be registered in a

commercial registry in Foreign Country A.

N.     On or about May 12, 2002, **HEIDARI** executed a loan agreement with Prospect

Telecom for approximately $1.5 million.

O.     On or about May 28, 2002, **HEIDARI** sent a letter to a person known to the

Grand Jury indicating that "money will be in account maximum up to end of May ... then we will

send Mr. Modares signature and you will be informed for signing the payment order to Mr.

Modanlu's account."

P.     On or about June 2, 2002, **MODANLO** called **HEIDARI'**s Iranian cell phone

number.

Q.     On or about June 3, 2002, **HEIDARI** caused approximately $1.5 million

to be wire transferred from an account in Foreign Country A into Prospect Telecom's account at

Bank A in Foreign Country A.

R.     On or about June 5, 2002, **MODARES** requested that $10 million be wire

transferred from Prospect Telecom's account at Bank A in Foreign Country A to an account at

First Union National Bank in Bowie, Maryland in the name of "New York Satellit (sic) Industries

LLC" ("the First Union NYSI account").

15

S.     On or about June 6, 2002, **HEIDARI, MODARES, MEHRDAD** and **MODANLO** caused a wire transfer of about $10 million to be made from Prospect Telecom's account at Bank A in Foreign Country A to the First Union NYSI account in Maryland.

T.     On or about August 22, 2002, **HEIDARI** and **MODARES** and a person known to the Grand Jury checked into two different hotels in Foreign Country A.

U.     On or about August 24, 2002, **MODANLO** checked into the Hotel Renaissance in Foreign Country A.

V.     On or about May 15, 2003, **HEIDARI** requested that a person known to the Grand Jury invite **HEIDARI, MODARES** and another person known to the Grand Jury from Iran to Foreign Country A so that they could meet "with [their] partner."

W.     On or about July 25, 2005, **HEIDARI** expressed his concern about the personal bankruptcy of **MODANLO,** filed on July 22, 2005, and how the bankruptcy could affect the money **MODANLO** owed **HEIDARI.  HEIDARI** also advised that a person known to the Grand Jury was "his Iranian lawyer for further coordination/instructions" and provided that individual's Iranian phone number and email address.

X.     On or about August 17, 2005, **HEIDARI, MODARES** and a person known to the Grand Jury met in Moscow, Russia.

Y.     On or about October 27, 2005, as a result of actions by the defendants, POLYOT launched into space from Plesetsk, Russia a rocket, built by POLYOT, that contained an Iranian earth satellite equipped with a camera.

Z.      On or about March 11, 2006, **HEIDARI, MODARES,** a person known to the Grand Jury and a person unknown to the Grand Jury met in Moscow, Russia.

AA.     On or about July 10, 2007, **HEIDARI** caused false information about Prospect Telecom be provided to the United States Bankruptcy Court for the District of Maryland in connection with the NYSI bankruptcy by causing lawyers for Prospect Telecom to state in response to Interrogatory No. 2 that "[t]he beneficial owners of Prospect Telecom are Reza Heydarj; Abdul Reza Mehrdad; and Mohammad Modares, all of Paris, France."

BB.     On or about November 27, 2007, **MODANLO** falsely stated in a deposition in connection with the NYSI bankruptcy that a FACS consultant initiated the Prospect Telecom-NYSI Loan Agreement and that the FAI consultant introduced **MODANLO** to the beneficial owners of Prospect Telecom.

18 U.S.C. § 371
18 U.S.C. § 3292

## COUNT TWO

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 33 and 35 through 44 and Overt Acts A through BB of

Count One are incorporated here.

2.      Between in or about April 2002 and in or about at least January 5, 2006, in the

District of Maryland and elsewhere, the defendant,

### NADER MODANLO,

did knowingly and willfully violate an order and regulation issued under Chapter 35 of Title 50,

United States Code, specifically the Iran Trade Embargo contained in Executive Orders 12959

and 13059 and 31 C.F.R. Part 560, to wit, being a United States person and conducting a

transaction that evaded and avoided, and had the purpose of evading and avoiding, and attempted

to violate, the prohibitions contained in 31 C.F.R. Part 560, by forming and causing to be formed

Prospect Telecom in Country A, and transacting and causing to transact business with Prospect

Telecom and its beneficial owners.


50 U.S.C. § 1705(b)
31 C.F.R. § 560.203
18 U.S.C. § 2
18 U.S.C. § 3292

## COUNT THREE

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 33 and 35 through 44 and Overt Acts A through BB of

Count One are incorporated here.

2.      Between in or about December 2001 and on or about October 27, 2005, in the

District of Maryland and elsewhere, the defendant,

### NADER MODANLO,

did knowingly and willfully violate an order and regulation issued under Chapter 35 of Title 50,

United States Code, specifically the Iran Trade Embargo contained in Executive Orders 12959

and 13059 and 31 C.F.R. Part 560, to wit, did export, sell and supply, and attempt to export, sell

and supply, directly and indirectly, from the United States, and by a United States person,

wherever located, services to Iran and the Government of Iran, except as otherwise authorized

pursuant to 31 C.F.R. Part 50, by providing and attempting to provide telecommunications

services to Iran and the Government of Iran, without having first obtained the required licenses or

authorizations from OFAC.


50 U.S.C. § 1705(b)
31 C.F.R. § 560.204
18 U.S.C. § 2
18 U.S.C. § 3292

## COUNT FOUR

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 33 and 35 through 44 and Overt Acts A through BB of Count One are incorporated here.

2.      Between in or about December 2001 and on or about October 27, 2005, in the District of Maryland and elsewhere, the defendant,

### NADER MODANLO,

did knowingly and willfully violate an order and regulation issued under Chapter 35 of Title 50, United States Code, specifically the Iran Trade Embargo contained in Executive Orders 12959 and 13059 and 31 C.F.R. Part 560, to wit, was a United States person, wherever located, and did engage in a transaction and dealing, and attempt to engage in a transaction and dealing, in and related to services for exportation, sale and supply, directly and indirectly, to Iran and the Government of Iran, except as otherwise authorized pursuant to 31 C.F.R. Part 50, by brokering and facilitating a transaction and dealing in and related to the exportation, sale and supply of telecommunications services without having first obtained the required licenses or authorizations from OFAC.

50 U.S.C. § 1705(b)
31 C.F.R. § 560.206
18 U.S.C. § 2
18 U.S.C. § 3292

## COUNT FIVE

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 33 and 35 through 44 and Overt Acts A through BB of Count One are incorporated here.

2.      On or about June 7, 2002, in the District of Maryland and elsewhere, the defendants,

**NADER MODANLO,**
**REZA HEIDARI,**
**a/k/a Reza Heydari,**
**a/k/a Reza Heidary,**
**a/k/a Reza Heydary,**
**MOHAMMAD MODARES,**
**a/k/a Mohammad Modarres,**
**and**
**ABDOL REZA MEHRDAD,**

did transport, transmit and transfer, and attempt to transport, transmit and transfer, funds to a place in the United States from or through a place outside the United States – a wire transfer of $10 million, more or less, from an account in Country A in the name of Prospect Telecom to an account at the First Union National Bank in Bowie, Maryland in the name of NYSI – with the intent to promote the carrying on of a specified unlawful activity, to wit, a violation of the International Emergency Economic Powers Act.


18 U.S.C. § 1956(a)(2)(A)
18 U.S.C. § 2
18 U.S.C. § 3292

## COUNTS SIX THROUGH TEN

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 33 and 35 through 44 and Overt Acts A through BB of Count One are incorporated here.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### NADER MODANLO,

knowingly engaged and attempted to engage in monetary transactions in and affecting interstate commerce in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity – to wit, criminal violations of the International Emergency Economic Powers Act, in violation of 50 U.S.C. § 1705 – in that the defendant did cause the following financial transactions to be made:

| COUNT | DATE | FINANCIAL TRANSACTION |
|:-----:|:----:|-----------------------|
| 6 | June 13, 2002 | Check no. 096 in the amount of $175,000, drawn on First Union account no. xxxxx-0535 in the name of NYSI and deposited into First Union account no. xxxxx-2800 in the name of FACS |
| 7 | June 18, 2002 | Check no. 097 in the amount of $725,000, drawn on First Union account no. xxxxx-0535 in the name of NYSI and deposited into First Union account no. xxxxx-2800 in the name of FACS |

| COUNT | DATE | FINANCIAL TRANSACTION |
|:---:|:---:|:---|
| 8 | September 5, 2002 | Check no. 1001 in the amount of $900,000, drawn on First Union account no. xxxxx-0535 in the name of NYSI and deposited into First Union account no. xxxxx-2800 in the name of FACS |
| 9 | January 16, 2003 | Wire transfer in the amount of $150,000 made payable to account no. 0415 at the Bank of Moscow, drawn on First Union account no. xxxxx-0535 in the name of NYSI |
| 10 | January 21, 2003 | Wire transfer in the amount of $650,000 made payable to account no. 0659 at the Savings Bank of the Russian Federation, drawn on First Union account no. xxxxx-0535 in the name of NYSI |

18 U.S.C. § 1957(a)
18 U.S.C. § 2
18 U.S.C. § 3292

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further charges that:

1.     Upon conviction of the offenses in violation of 18 U.S.C. § 371, 50 U.S.C. § 1705(b), 18 U.S.C. §§ 1956(a)(2)(A) and 1957, and 18 U.S.C. § 2, as set forth in Counts One through Ten, each charged defendant shall forfeit to the United States of America, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. §§ 981(a)(1)(C) and 982, any property, real or personal, which was involved in such an offense or was traceable to such an offense.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in the offense set forth in Count One.

2.     The property to be forfeited includes, but is not limited to:

      a.     $10,000,000.00 in United States currency and all interest and proceeds traceable thereto;

3.     If any of the property described above in subparagraph 2(a) as being subject to forfeiture, as a result of any act or omission of any defendant --

      a.     cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or,

      e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of said defendants, up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982
28 U.S.C. § 2461(c)

_____
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

_____6 - 2 - 2010_____
Date

25